Nicholson, C. J.,
delivered the opinion of the court:
These cases raise the question as to the constitutionality of the act of March loth, 1875, entitled “An act to abolish the second circuit court and the second chancery court of Shelby county.” [Acts 1875, ch. 23]. This act abolishes these two courts from and after the third Monday of Sept., 1875, as to the second circuit court, and from and after the first Monday of October, 1875, as to the second chancery court, and at those dates requires all the records and papers of those two courts to he transferred to the first circuit and the first chancery courts, respectively; and that the cases then pending in said second circuit and second chancery courts, shall he heard and determined in the respective courts to which they are transferred. It also repeals an act passed December 4, 1869 [Acts 1869-70, ch. 28], by which the courts of Shelby county were reorganized, and the second circuit and the second chancery courts were established.
The question is, whether the legislature had the power, under the constitution, to abolish these two courts and to transfer the causes therein pending, to be heard and determined in the other two courts in Shelby county, to which they were transferred.
*358 If the legislature had the power to enact the law, it must be either because the ordaining or establishing of courts is a legitimate legislative power, necessarily involving the po.wer to abolish, as well as to ordain and establish, and that the constitution has placed no restriction upon the exercise of this power inconsistent with the action of the legislature in the present case; or because the constitution, expressly or by necessary implication, has vested in the legislature the power to ordain and establish courts, and that this power carries with it the power of abolishing existing courts.
It is maintained by the attorney-general and counsel for the state, that the act in question is constitutional and valid, on both of these grounds. While the counsel for tire rela-tors insist that the two courts abolished by the act were so guarded and protected by the constitution, that in the exercise of its power to ordain and establish courts these two courts could not be abolished.
The two courts now in question were ordained and established by the act of December 4th, 1869 [Acts 1869-10, ch. 28], the first section of "which abolished the several courts of law and equity, and the criminal court then existing in Shelby county, and in their stead ordained and established three circuit courts and one criminal court apd two chancery courts in said county.
With the abolition of the existing courts the judges thereof were displaced, and new judges were elected to' fill the new courts so ordained and established.
This action of the legislature took place under the constitution of 1834, which provided “that the judicial power of this state shall be vested in one supreme court, in such inferior courts as the legislature shall from time to- time ordain and establish, and the judges thereof,” etc. [See art. 6, sec. 1]. It was under the power herein recognized that the legislature ordained and- established the new courts in Shelby county, and in exercising this power abol *359 ished the existing courts. The validity of this action of the legislature was recognized and acquiesced in by the convention of 1870, and the courts so ordained and established have continued until two of them were abolished, and their jurisdiction transferred to two others of the same county by the act of 1875 already referred to.
If the convention of 1870 have adopted the same provision in the constitution of 1870 in declaring the manner in which the judicial power of the state was to- be vested, it would be difficult to resist the conclusion, that they adopted it with the intention of recognizing in the legis-ture the same power which was conceded to them under the constitution of 1834.
The provision in the constitution of 1870 is as follows: “ The judicial power of this state shall be vested in one supreme court, and in such circuit, chancery and other inferior courts as the legislature shall from time to time ordain and establish, in the judges thereof,” etc.' [See art. 6, sec. 1.]
It is observed that as to the power being vested in “one supreme court,” the language of the two constitutions is the same; but as to the power vested in the inferior courts; there is this difference in the language: In the constitution of 1834, the judicial power was to be vested in such inferior courts as the legislature, from time to time, might ordain and establish. In the constitution of 1870, the power is to be vested in such circuit, chancery and other inferior courts as the legislature might, from time to time, ordain and establish.
We have assumed as undeniable, that the convention of 1870, in recognizing the validity of the act-of December 4, 1809 [Acts 1869-70, ch. 28], understood the language in the constitution of 1834 — “in such inferior courts as the legislature shall from time to time ordain and establish — ” as conferring upon, or recognizing in the legislature, the power to abolish existing courts in the exercise of the *360 power to ordain aiid establish inferior courts. The question then is, what is the extent of the limitation or restriction imposed upon the power of the legislature, in the constitution of 1S70, by the introduction into the clause of the words, “in such circuit, chancery and other inferior courts,” the -words “circuit” and “chancery” being the only new words inserted.
It is clear that under the constitution of 1834, there was no restriction on the power of the legislature in ordaining and establishing inferior courts, unless such restriction existed in some other clause of the constitution. The power existed under that constitution to ordain and establish inferior courts, which would be neither circuit nor chancery courts,'or they could dispense altogether with chancery courts as a distinct system, and ordain and establish none but law courts, with chancery jurisdiction.
But, under the constitution of 1870, the power to ordain and establish inferior courts was accompanied with this important restriction — that circuit and chancery courts should continue to be ordained and established as a part of the system of inferior courts: In other words, by the language used, the legislature was prohibited, in ordaining and establishing inferior courts, from dispensing with circuit and chancery courts. At the time the constitution used this language, there was in operation a system of circuit and chancery courts. The terms “circuit and chancery courts” were no doubt used to designate such a system as then existed, but not to indicate that that system was to be permanent as then organized, but only that the legislature in the future ordaining and establishing of inferior courts, should ordain and establish circuit and chancery courts.
The language is, “such circuit, chancery and other inferior courts as the legislature shall, from time to time ordain and establish;” this language has no reference to the existing courts, but clearly contemplates such courts as the *361 legislature should in the future ordain and establish; it as clearly contemplates the exercise of a discretion on the part of the legislature; it refers to such circuit and chancery courts as the legislature shall from time to time ordain and establish. The power was not to be exhausted by ordaining and establishing circuit and chancery courts at one time, but it was a continuing power, to be exercised from time to time, whenever the legislature in its judgment should determine that the public interest required the exercise of the power.
Our conclusion is, that the only difference in the meaning of the clauses iq the two constitutions is, that in that of 1834 there was no restriction upon the legislature as to the character of the system of inferior courts which they might ordain and establish; but in that of 1870 they were prohibited from so ordaining and establishing inferipr courts as to disregard the distinctive characters of circuit and chancery courts, but that the power, in ordaining and establishing circuit, chancery and other inferior courts, was intended to be the same, so far as abolishing existing courts and ordaining and establishing others was involved, under the constitution of 1870 as under the constitution of 1834.
This construction of the two constitutions is controverted by the relator’s, who insist that under the constitution of 1870 the circuit and chancery courts are as much constitutional courts as is the supreme court, and that all are alike protected by the constitution against the power of the legislature to blot out or abolish. It is conceded on all sides that the supreme court is protected by the constitution against any infringement by the legislature. It is provided that there shall be but one supreme court, the number of its judges is fixed, and the places of its sessions are designated. These provisions show that it is the direct creature of the constitution and subject to- no* invasion by the legislature.
*362 No such. provisions are made as to the circuit and chancery courts. They are recognized as species of courts which cannot be dispensed with by the legislature, but courts which the legislature may from time to' time ordain and establish. The number of circuits is not fixed, nor the number of chancery districts. The places at which these courts may be held are not designated. No specific arrangement of counties into circuits or districts is made or recognized in the constitution. In all these respects, they differ from the supreme court, and as to all these matters the power of the legislature is unquestionable. In one sense, however, circuit and chancery courts may be properly termed constitutional courts; they are recognized as species of courts that are to continue, but no specific courts are so recognized. On the contrary, the circuit and chancery courts so recognized by the constitution, are such ns the legislature may from time to time ordain and establish.
It is said, however, for the relators, that although it may be true that the circuit and chancery courts are to be ordained and established, they derive their powers from the constitution, and, therefore, they are constitutional courts. In one sense this is true, for we see no difference whether the power of the circuit and chancery courts is vested hi them directly by the constitution, or indirectly through the action of the legislature. In either view, they are constitutional courts, that- is, courts ordained and established by constitutional authority. Exactly the same is true as to all other inferior courts ordained and established by the legislature. They are so ordained and established by the authority of the constitution and are therefore constitutional courts. But it does not follow either as to circuit and chancery or other inferior courts, that because they are constitutional, therefore they are protected from abolition in some future process of ordaining and establishing courts. The provision of the constitution which authorized the legislature to ordain and establish other inferior courts, *363 authorizes them to ordain and establish circuit and chancery courts, and, as to all, the provision is that they may be so ordained and established from time to time. Thus expressly providing that when circuit and chancery or other inferior courts are ordained and established by the legislature, they still continue subject to' the power of the legislature to be ordained and established from time r,o time, as often as, and whenever the legislature may believe the public good requires it.
It is further insisted for relators, that, the power of the legislature to ordain and establish circuit and chancery courts, does not include the power to abolish existing courts, but that it only extends to adding to or increasing them. If this position be correct, it may follow that at some future time, the legislature upon a real exigency might ordain and establish several additional circuit and chancery courts in different localities, which courts could not afterwards be abolished, even if the change in the country should make it ever so plain that they had become unnecessary and a useless burden. It is even possible, under this view, that we might have a legislature which would determine that the public good required a separate circuit and a separate chancery court in every county in the state, to be filled by a judge and chancellor for each county, and should so ordain and establish nearly two hundred courts, to be filled by the like number of judges and chancellors. Of course such a state of things is only possible — yet it would result that a subsequent legislature would have no power to so ordain and establish the courts as to diminish their number, their only power being that of increasing it.
The result would follow from giving the words, “ordain and establish,” their literal meaning, and also assuming that the power thus given to “ordain and establish” excludes any other power by the legislature. We are unable to yield our assent to either of the positions.
We have already alluded to the fact that under the con *364 stitution of 1834, which contained the same words, the legislature, in December, 1869 [Acts 1869-70, ch. 28], ordained and established the two courts now in question, after abolishing the then existing courts, and that the convention, with a knowledge of this fact, expressly recognized the validity of the act, and provided for the continuance of the judges directed to fill the offices so created, from the date of their election in May, 1870, until eight years after the general election of other judges in August, 1870. But we may nowjidd that the constitution of 1796 [Art. 5, sec. 1] contained words of similar import, “direct and establish,” and from that date down to 1875, the legislature repeatedly acted upon the assumption that they had the power, in ordaining and establishing courts, to abolish the courts in existence when such abolition was deemed necessary in ordaining and establishing other courts. No- question was ever made as to the validity of these acts, and we know that some of our most learned and eminent judges have left on record their dicta, in which are to be found their opinions as to the correctness of the legislative construction of the constitution, although we. concede that these opinions so expressed are not entitled to the full weight of adjudications. We believe we may safely add that the legal profession has acquiesced without dissent in the correctness of the legislative construction.
We do not rely upon these historical facts as conclusive of the construction of the clause of the constitution under consideration, but we regard such contemporary and long acquiesced in construction by the legislature and the legal profession as of much weight in determining the meaning of the words in the constitution, which we are called on to construe.
In regard to the constitution of the United States, it was objected in the case of Stewart vs. Laird, 1 Cranch, 299, that the judiciary act of 1789 was unconstitutional on the ground' that it assigned circuit duty to' the judges of the *365 supreme court. “To this objection, which, is of recent date,” said the court, “it is sufficient to observe, that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed tire construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled.” In Moore v. City of Reading, 21 Penn., 188, it was said: “The uniform construction given to a provision of the constitution by the legislature, with the silent acquiescence of the people, including the legal profession and the judiciary, and the injurious results which would ensue from a contrary interpretation, are proper elements of a judgment on the subject.”
But it is not necessary that we should rely upon these authorities, conclusive as they are, to sustain the construction of the constitution, so repeatedly acted upon by the legislature, and so long acquiesced in by the people, and the courts. IJpon a fair view of the object intended to bo accomplished and the circumstances under which the language was used in the constitution, we are of opinion it will properly bear the construction placed upon it by the legislature. The object was to provide a system of courts that anight be adopted. Hence, it was not deemed proper by the convention of 1870 to fix permanently, by constitutional recognition, the systems of inferior courts then in operation, although they embraced the entire state. Por the purpose of providing for future contingencies and 'exigencies, they were content to leave the ordaining and establishing of the inferior courts from time to time, to the discretion of the legislature, with the single restriction as to the continuance of circuit and chancery courts. It is the legitimate business of the legislature to determine how many courts are necessary, and-how the various circuits and districts should be arranged and formed. It was proper *366 that the representatives of the people, session after session, should have the power- to provide such changes in the circuits and districts, as should be shown by experience and observation to be necessary for the public good. This was the power conceded to the legislature by the convention, when it was provided that they should ordain and establish such circuit, chancery and other inferior courts, as they should deem necessary from time to time. The ordaining and establishing of such courts, was to be the .business'of the legislature through all time. It was impossible that the object to be accomplished, could be effectuated by simply adding to the number of circuits and districts. Changes would or might, become necessary, which involved the necessity of abolishing existing circuits or districts, in ordaining and establishing others, or in reducing the number, if experience should prove that the public good required a reduction. The power to abolish for the purpose of effecting these objects, was therefore necessarily implied. It was not intended that the power to abolish districts should be exercised Avith the view of depriving any portion of the people of courts, but as a means of so ordaining and establishing the courts as would better promote the public good. It is proper to add that any attempt of the legislature to exercise this restricted power of abolishing existing courts, for the purpose of depriving the public of the requisite number and character of courts, would be an abuse of power, which Ave have no right to anticipate, and which was not anticipated by the constitution. Against such abuse of legislative power, the .ballot box is the legitimate remedy.
It has.no doubt been upon this AÚeAV of the meaning of the power to “ordain and establish” courts, that the various acts of the legislature have been passed, as well as the act noAv under consideration, and we are satisfied that the construction so acted upon is correct.
We have not been able to discover in the act in question *367 the dangers to the independence of the judicial department of the government which has been dwelt upon in the argument with much earnest eloquence. Nor do' we see in it any evidence that the legislature.resorted to this as an indirect mode of removing obnoxious judges. It appears to us to be the exercise of a legitimate power by the legislature, under the conviction that two of the courts in Memphis were unnecessary for the dispatch of the public business, and therefore that for the promotion of the public good, they were abolished as useless, and their work assigned to two other existing courts. We have no reason to suppose that the two judges, whose offices depended upon the continuance of the former law, were in any way obnoxious to the legislature or the people, hut were regarded as entirely worthy of their positions. The act cannot therefore be regarded as an abuse of the power of removal for reasons personal to the judges; nor do we see how the danger of such an abuse of power hereafter could be in any way guarded against or prevented by that construction of the constitution which would render the act of the legislature null and void.
We have not deemed it necessary to discuss the bearing upon the case of those clauses of the constitution which provide for the salaries and the terms of service of the judges, for the reason that we consider it too clear for argument, that if the law abolishing the courts) is valid, the offices and their incumbents necessarily cease, and, of course, along with them their salaries. In our view of the constitution, the judge’s right to his full term and his full salary is not dependent alone upon his good conduct, but also upon the contingency that the legislature may for the public good, in ordaining and establishing the courts, from time to time, consider his office unnecessary and abolish it. The exercise of this power by -the legislature is neither such as interferes with the independence of the judge or with his tenure of office, as can be properly complained of. *368 The powei* may possibly be exercised without good cause, but in such case the courts can furnish no remedy.
We have examined carefully the several cases from other states, in which their respective constitutions have been construed, in determining questions somewhat analogous to that before us, but we have found nothing, either in the-reasoning of the judges, or in the adjudications of the cases, which generate any doubt in the correctness of the construction heretofore and now placed'upon our own constitution.
The result is that we are of opinion, and so hold, that the act in question is constitutional and valid, and the judgment of the cpurts below will be reversed.